**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**NORTHERN DIVISION**

| | |
|---|---|
| **JIMMIE G. BAKER,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **No. 2:20-CV-26 PLC** |
| | ) |
| **KILOLO KIJAKAZI,[1]** | ) |
| **Acting Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

**MEMORANDUM AND ORDER**

Plaintiff Jimmie G. Baker seeks review of the decision of Defendant Social Security Acting Commissioner Kilolo Kijakazi denying his applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under the Social Security Act. For the reasons set forth below, the Court affirms the Commissioner's decision.

I.    **Background and Procedural History**

In August 2017, Plaintiff, who was born in August 1970, filed applications for DIB and SSI, alleging that he was disabled as of June 25, 2016 as a result of diabetes, peripheral neuropathy, a right rotator cuff tear, numbness and tingling of the hands and feet, carpal tunnel syndrome, hypertension, sleep apnea, and depression.  (Tr. 11, 77-78, 188-191, 192-197, 230)  The Social Security Administration (SSA) denied Plaintiff's claim, and he filed a timely request for a  hearing before an administrative law judge (ALJ).  (Tr. 11, 92-108)  The SSA granted Plaintiff's request for review and conducted a hearing on February 15, 2019.  (Tr. 11, 36)

---

[1] Kilolo Kijakazi became the Acting Commission of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted, therefore, for Andrew Saul as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of 205(g) of the Social Security Act, 42 U.S.C. §405(g).

In a decision dated April 4, 2019, the ALJ applied the five-step evaluation set forth in 20 C.F.R. §§ 404.1520 and 416.920, and concluded that Plaintiff "has not been under a disability, as defined in the Social Security Act, from June 25, 2016, through the date of this decision." (Tr. 8-34) Plaintiff filed a request for review of the ALJ's decision with the SSA Appeals Council, which denied review. (Tr. 1-3, 120-21)  Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the Commissioner's final decision.  Sims v. Apfel, 530 U.S. 103, 106-07 (2000).

## II.     Evidence Before the ALJ[2]

### A.  Plaintiff

Plaintiff was forty-nine years old at the time of hearing and lived with his girlfriend. (Tr.  40) Plaintiff's work history included positions as a cashier, shelf stocker, loader, tow motor driver, and call center representative. (Tr.  63-68) Plaintiff had a high school diploma, and "small engine" and "arc welding" certifications. (Tr.  40)

In 2015, Plaintiff left a position at Walmart as a stocker, loader, and cashier because a medication he was taking, Meloxicam, caused him "to have spells where [he] would be completely unaware of what was going on" and he "ended up driving home and…[did] not remember how [he] made it [there]." (Tr.  64) Plaintiff stated when he worked as a seasonal call center representative in 2013, he suffered mental stress from the customer complaints and hand cramping from the computer work. (Tr.  65-66)

Plaintiff's most recent employment as a cashier, shelf stocker, and loader at Big Lots ended June 25, 2016, after a February 2016 work injury in which Plaintiff tore his right rotator cuff and injured his back. (Tr.  41, 63) Plaintiff underwent surgery to repair the rotator cuff tear and

---

[2] Because Plaintiff does not challenge the ALJ's determination that his alleged conditions of a knee injury, rheumatoid arthritis, anxiety, and paranoia were not medically determinable, the Court limits its discussion of the evidence to Plaintiff's medically determinable conditions.

participated in physical therapy three times a week for five months. (Tr.  48)  Plaintiff stated he had a "chronic tear of the shoulder" and he continued to have radiating shoulder pain after the rotator cuff surgery. (Tr.  52-54) Plaintiff clarified that his shoulder and back pain were "aggravated" in Fall 2017 when a weight machine "jerked everything" during a functional capacity exam related to his worker's compensation claim. (Tr.  52-53, 55)  Since that injury, Plaintiff had been using a cane to walk. (Tr.  47, 55)

Plaintiff experienced both upper and lower back pain. With regard to his upper back pain, Plaintiff testified that his physicians have attempted "some pain management" but they "haven't done anything" for his upper back pain because "they said that if they…did the rods in the upper back, that it would basically crack my ribs if I coughed[.]" (Tr.  42)  For Plaintiff's low back pain, doctors administered steroid injections and were planning to perform a "nerve block" to alleviate some of that pain as well as "the pain and numbness going down the legs." (Tr.  42,  54) Plaintiff sought treatment in the emergency room after exacerbating his back pain in June 2018 while moving seven- to eight-pound boxes and again in August 2018 when he lifted a ten-pound bag of potatoes. (Tr.  54-55)

For his back pain, Plaintiff took Tylenol regularly, Tylenol #3 with codeine during "extreme flare up[s]," and "some muscle relaxers a lot of times." (Tr.  42-43)  In addition to these pain medications, Plaintiff took Lisinopril, Atorvastatin, gabapentin, Naproxen, Januvia, Lantus, Victoza, and Cymbalta. (Tr.  42-43, 54-55)

Plaintiff began treatment for diabetes approximately 10 to 15 years earlier and currently required daily insulin injections. (Tr.  42-43, 54-55) Plaintiff testified his diabetes caused daily neuropathy in his feet which "goes up as far as the knees when it is acting up[,]" and occasionally

"goes into the hands too." (Tr. 55) He experiences "pins and needles" in his feet when sitting with his feet flat. (Tr. 56)

Plaintiff also experienced pedal edema a "couple of times a week[.]" (Tr. 55-56) Due to the edema, Plaintiff had "to watch what [he did] and [] how much salt [he used,]" and elevated his legs to reduce the swelling. (Tr. 55-56)

Plaintiff had carpal tunnel syndrome in both hands. (Tr. 56) Plaintiff had corrective surgery on his right hand but not on the left hand because it "wasn't bad enough to do surgery on." (Id.) Plaintiff testified he experienced daily pain in his wrists and hands, and that his hands "draw up" into "a claw." (Id.)

Plaintiff was also diagnosed with sleep apnea five years prior to the hearing. (Tr. 57) Plaintiff was prescribed a continuous positive airway pressure machine but was not currently using it because the mask needed to be refitted. (Tr. 57)

Plaintiff suffered from mild migraines at least once a week and severe migraines once or twice a month. (Id.) Plaintiff did not take any medications for his migraines, which generally lasted until he went to sleep for the night. (Tr. 58, 64)

Plaintiff testified he had some "gastrointestinal stuff due to some stomach problems" and that an MRI of the intestines revealed diverticulitis. (Tr. 46) At the hearing, Plaintiff stated he had "not had the chance to get any of [his gastrointestinal problems] checked out" but that it "seem[ed] like it's progressed." (Tr. 46)

Plaintiff also testified regarding his mental health conditions. Plaintiff stated he "has always had very mild depression" but that his depression and anxiety went "through the roof" after his workplace injury. (Tr. 59) Plaintiff was hospitalized in late October and early November 2018 for an attempted suicide. (Tr. 59) Plaintiff explained that in the year preceding his hospitalization,

4

he lost custody of his son and was homeless for several months after his sister "kicked him off" their mother's property following her death. (Tr. 50-51, 58-59) Plaintiff testified he took Cymbalta for his anxiety and depression, but it negatively affected his concentration. (Tr. 44) For a period of time, Plaintiff attended individual counseling every two weeks with Pamela Lightle, a licensed professional counselor at Advanced Counseling, to treat his depression and anxiety, and as part of his service plan to regain custody of his son. (Tr. 45, 60-62) Plaintiff also participated in group counseling sessions a couple times a month at Preferred Family for "anger management" related to "agitation and aggression" caused by his pain. (Tr. 45, 60)

When the ALJ questioned Plaintiff about his daily activities, Plaintiff testified he typically spent his day sitting in a straight back chair or in a recliner, or lying down in bed depending "on how bad [his] back [was] for the day." (Tr. 58) Plaintiff testified that, when his back was not bothering him, he spent his time playing games on his phone or watching the news. (Tr. 49-50) Plaintiff was able to drive and attended to his personal care such as dressing, eating, and bathing, but "[took] his time with it." (Tr. 47) Plaintiff prepared his own meals but sat down to rest while cooking due to back pain. (Id.) Plaintiff performed some of the housework but required help because his "back doesn't tolerate a lot of it." (Tr. 47-48) In the year preceding the February 2019 hearing, an aide with Northeast Independent Living Services had been coming to Plaintiff's home twice a week to assist with cleaning and cooking. (Tr. 58)

With regard to his social interactions, Plaintiff testified that he met his girlfriend online nine months prior to the hearing and that he had recently met some friends through his therapy group and Hope House. (Tr. 50) Plaintiff's friends occasionally visited him at home and they watched movies together when Plaintiff was "feeling up to it[.]" (Id.)

As of the date of the hearing, Plaintiff was able to stand for 15 minutes at a time. (Tr.  40, 59) When the ALJ asked Plaintiff what was the most weight he could lift, Plaintiff stated "[b]ecause of the back, I am on a weight restriction of ten pounds or less…. And on the [] right shoulder, I am on a weight restriction of eight pounds or less." (Tr.  51-52)  Plaintiff testified Dr. Tameem Yehyawi with Columbia Orthopedic, his shoulder surgeon, gave him these restrictions approximately 18 months prior to the hearing. (Tr.  52, 431) Plaintiff stated he was confined to his bed, lying flat, four to six days a month due to back pain triggered by standing too long, sitting in the wrong position, or lifting something. (Tr.  48-49)

B.  Vocational Expert

Vocational expert Bob Hammond also testified at the hearing. (Tr.  69) The ALJ asked Mr. Hammond vocational expert to consider a hypothetical individual with Plaintiff's age, education, and work experience who could perform sedentary work with the following limitations:

> lift ten pounds on occasion and could stand/or walk two out of eight hours and could sit six out of eight hours, all with normal breaks. And that the person would be limited to simple and/or repetitive work that didn't require close interaction with the public in the sense of no work requiring, [] customer service jobs or retail sales. And that the person would be limited to frequent, not repetitive use of the right upper extremity for fine and gross manipulation. And limited to occasional use of the right upper extremity for work above shoulder level….
>
> …
>
> No ladders, ropes or scaffolds. And no working at unprotected dangerous height or unprotected dangerous machinery. No jobs that would expose the person to whole body vibration such as operating heavy equipment, either off road or on road. No jobs that require ambulating on unimproved terrain such as open fields or construction sites. And I'm going to limit the person to occasional stoop, kneel, crouch, and crawl. And also avoid concentrated exposure to extreme cold.

(Tr.  70-72)  Mr. Hammond concluded that such an individual could not perform Plaintiff's past work but could perform other jobs such as a circuit board screener or a semiconductor bonder, both sedentary jobs. (Tr.  71-72)  In addition, Mr. Hammond explained that the individual could

still perform these jobs if the limitation of frequent use for fine and gross manipulation of the right upper extremity was extended to the left. (Tr.  72-73)

The ALJ modified the hypothetical addressed to Mr. Hammond as follows: the individual would miss two or more days a month. (Tr.  72) In response to the modified hypothetical, Mr. Hammond asserted that these absences would preclude competitive employment as a circuit board screener or a semiconductor bonder.  (Id.)  In regard to absences, Mr. Hammond stated that employers generally tolerated "one day a month after a probationary period of 90 days, no more than ten days in a 12-month period." (Tr.  73) Mr. Hammond also noted that an individual who needed to elevate his legs while working or take additional breaks, resulting in being "off task more than 10% of the productivity level that's required by the employer[,]" would be precluded from competitive employment. (Tr.  72-73) Upon questioning by Plaintiff's counsel, Mr. Hammond testified that if Plaintiff was limited to: (1) using his hands only occasionally, or (2): sitting only four hours in an eight-hour day, no occupations were available.  (Tr.  74)

C.  Medical Records

In regard to Plaintiff's medical records, the Court adopts the facts that the Commissioner admitted and that Plaintiff set forth in his statement of material facts. [ECF Nos. 18-1, 23-1] The Court also adopts the facts contained in the Commissioner's statement of additional facts because Plaintiff did not dispute them. [ECF Nos. 23-1, 24].[3]

III.  Standards for Determining Disability Under the Social Security Act

Eligibility for disability benefits under the Social Security Act ("Act") requires a claimant to demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Act defines disability as the "inability to engage in any substantial gainful activity by reason

---

[3] Relevant medical records are discussed in detail below.

of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); see also 20 C.F.R. §§ 404.1505(a), 416.905(a). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy ...." 42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled, the ALJ engages in a five-step evaluation process. See 20 C.F.R. §§ 404.1520(a), 416.920(a). Those steps require a claimant to first show that he or she is not engaged in substantial gainful activity. Id. Second, the claimant must establish that he or she has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.152(a), (c); 416.920(a), (c). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [the claimant's] ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001)). At step three, the ALJ considers whether the Plaintiff's impairment meets or equals an impairment listed in 20 C.F.R., Pt. 404, Subpart P, Appendix 1. 20 C.F.R. §§ 404.1520(a), (d); 416.920(a), (d).

Prior to step four, the Commissioner must assess the claimant's residual functional capacity (RFC), which is "the most a claimant can do despite [his or her] limitations." Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); 20 C.F.R. §§ 404.1520(a), (e), 416.920(a), (e). RFC is "based on all relevant evidence including the medical records,

observations of treating physicians and others, and an individual's own description of his [or her] limitations." Id. (quoting Lacroix v. Barnhart, 465 F.3d 881, 887 (8th Cir. 2006)).

At step four, the ALJ determines whether the claimant can return to his or her past relevant work by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a), (f); 416.920(a), (f); see McCoy v. Astrue, 648 F.3d 605, 611 (8th Cir. 2011). If the claimant can still perform past relevant work, the claimant will not be found to be disabled; if the claimant cannot, the analysis proceeds to the next step. McCoy, 648 F.3d at 611.

Through step four, the burden remains with the claimant to prove that he or she is disabled. Moore, 572 F.3d at 523. At step five, the burden shifts to the Commissioner to establish that, given the claimant's RFC, age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform. 20 C.F.R §§ 404.1520(a), (g); 404.1560 (c); 416.920(a), (g); 416.960(c); Brock v. Astrue, 674 F.3d 1062, 1064 (8th Cir. 2012). If the claimant cannot make an adjustment to other work, then he or she will be found to be disabled. 20 C.F.R. §§ 404.1520(g), 416.920(g).

## IV.    ALJ's Decision

Applying the five-step evaluation process, the ALJ found Plaintiff: (1) had not engaged in substantial gainful activity since June 25, 2016, the alleged onset date; and (2) had the severe impairments of degenerative disc disease of the lumbar and thoracic spine, diabetes mellitus with peripheral neuropathy, bilateral carpal tunnel syndrome, status-post right shoulder surgery for rotator cuff repair, clinical obesity, and depression. (Tr. 13) The ALJ concluded Plaintiff had the non-severe impairments of sleep apnea, hypertension, "fatty liver," diverticulitis, a hernia, and migraines. (Tr. 14-15). The ALJ found Plaintiff's alleged impairments of a knee injury,

rheumatoid arthritis, anxiety, and paranoia were not medically determinable. (Id.) At step three, the ALJ determined Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr.  15-17).

Based on his review of the record and Plaintiff's testimony, the ALJ determined Plaintiff's "medically determinable impairments could reasonably be expected to cause *some* of the alleged symptoms" but Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" (Tr.  20) The ALJ found objective imaging confirmed Plaintiff had "serious abnormalities of his thoracic and lumbar spine" which limited Plaintiff "to a range of sedentary work at most" but objective evidence did not support Plaintiff's allegation of conditions that would prevent him from sustaining any work on a regular and continuing basis. (Tr.  20) In support, the ALJ noted that Plaintiff declined several treatments for his back pain, including an offer of prescription muscle relaxers and seemingly did not comply with the provider's alternative recommendation to obtain a low-cost TENS unit. (Tr.  24)  The ALJ also considered Plaintiff's daily activities, finding Plaintiff's testimony that he was able to drive was "not reasonably consistent with his allegations of fully debilitating back pain and lower extremity symptoms that required him to lay down or elevate his legs on a regular basis during the day." (Tr.  24)

The ALJ determined Plaintiff had the RFC to:

perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except he can never climb ladders, ropes, or scaffolds, and he can only occasionally stoop, kneel, crouch, and crawl. He is limited to frequent but not repetitive use of his bilateral upper extremities for fine and gross manipulation, and can only occasionally use his right upper extremity to perform work above shoulder level. He must avoid working at unprotected, dangerous heights or around unprotected, dangerous machinery, and he must avoid concentrated exposure to extreme cold. He can perform no jobs that would expose him to whole body vibrations…and no

jobs that require ambulating on unimproved terrain[.] The claimant is limited to performing simple and/or repetitive work that does not require close interaction with the public (e.g. he can perform no customer service or retail sales occupations).

(Tr. 18) Based on the vocational expert's testimony, the ALJ concluded Plaintiff was unable to perform any past relevant work. (Tr. 28)  However, based on the RFC, Plaintiff's age, education, and prior work experience, and the vocational expert's testimony, the ALJ found Plaintiff was able to perform other jobs that existed in significant numbers in the national economy, such as circuit board screener or semi-conductor bonder. (Tr. 29)  The ALJ therefore concluded Plaintiff was not disabled. (Tr. 29-30)

## V.      Discussion

Plaintiff asserts the ALJ's mental RFC determination was not supported by substantial evidence because the ALJ improperly weighed the medical opinion evidence and failed to fulfill his duty to develop the record. [ECF No. 18 at 13-14] Specifically, Plaintiff contends the ALJ assigned too much weight to the opinion of the non-examining state-agency consultant and too little weight to the opinion of Ms. Lightle, Plaintiff's treating counselor. [Id. at 13] Plaintiff argues the ALJ erred in discounting Ms. Lightle's opinion for failing to support her opinion with treatment notes from counseling sessions and because Ms. Lightle's opinion was supported by the record as a whole. [Id. at 13-14] Plaintiff contends the ALJ should have ordered a consultative mental health examination in order to adequately develop the record and to determine Plaintiff's mental health limitations. [Id. at  14]

Plaintiff also argues that substantial evidence does not support the ALJ's physical RFC and his determination that Plaintiff could perform a limited range of sedentary work. [Id. at 15-20] More specifically, Plaintiff contends the ALJ erroneously found the medical records were inconsistent with Plaintiff's testimony that he felt at risk of falling and needed to lie down due to

his back pain, and the evidence established that Plaintiff could not lift 10 pounds on an occasional basis. [Id. at 16-17] Finally, Plaintiff maintains the ALJ's physical RFC determination is not supported by substantial evidence because the AJL's decision not to include limitations to account for Plaintiff's diabetic neuropathy was based on the ALJ's independent medical findings. [Id. at 18]

In response, the Commissioner asserts the ALJ properly evaluated the evidence in the record, including the medical opinion evidence, in determining Plaintiff's mental RFC.[4] The Commissioner also maintains the ALJ was not required to order a consultative mental health examination because there was sufficient evidence in the record regarding Plaintiff's mental health condition to determine Plaintiff's limitations. [ECF No. 23 at 4-8] In regard to the ALJ's physical RFC determination, the Commissioner argues the ALJ's decision is supported by substantial evidence in that the ALJ properly evaluated Plaintiff's "statements and allegations about his symptoms and limitations" in conjunction with Plaintiff's activities, and the ALJ's evaluation of the objective medical evidence. [ECF No. 23 at 9-10].

A. Standard of Judicial Review

A court must affirm an ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Chesser v. Berryhill, 858 F.3d 1161, 1164 (8th Cir. 2017) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)). A court must consider "both evidence that supports and evidence that detracts from the ALJ's

_____

[4] The Commissioner summarily presents an alternative argument that the "medical opinion" on which Plaintiff relies in support of additional mental RFC limitations does not constitute a "medical opinion" under the Social Security Act. [ECF No. 23 at 6] Plaintiff did not respond to the Commissioner's argument in her reply. [ECF No. 24]  Because the Court resolves Plaintiff's claim of error based on the Commissioner's primary argument, the Court does not address the Commissioner's alternative basis for affirming the ALJ's decision.

determination, [but it] may not reverse the Commissioner's decision merely because substantial evidence supports a contrary outcome." Id. (quoting Prosch, 201 F.3d at 1012) (internal quotation marks omitted).

A court does not "reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence." Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)). Therefore, a court must affirm the ALJ's decision if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings[.]" Wright v. Colvin, 789 F.3d 847, 852 (8th Cir. 2015) (quoting Perkins v. Astrue, 648 F.3d 892, 897 (8th Cir. 2011)).

B. RFC

Plaintiff challenges the ALJ's determination of his mental and physical RFC. RFC is the most a claimant can do in a work setting despite that claimant's physical or mental limitations. Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (citation omitted); 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ determines a claimant's RFC "based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of [his or her] limitations." Kraus v. Saul, 988 F.3d 1019, 1024 (8th Cir. 2021) (quoting Papesh v. Colvin, 786 F.3d 1126, 1131 (8th Cir. 2015)); 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, "a claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001) (quoting Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000)). "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be

supported by some medical evidence of the claimant's ability to function in the workplace." Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016) (quoting Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007)). "An administrative law judge may not draw upon his own inferences from medical reports." Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).

     1.  Mental RFC

Plaintiff contends the ALJ's mental RFC determination is not supported by substantial evidence because the ALJ improperly weighed the medical opinion evidence and failed to develop the record by ordering a consultative mental health examination. [ECF No. 18 at 13-15] The Commissioner argues the ALJ properly evaluated the medical opinion evidence and that there was sufficient evidence in the record regarding Plaintiff's mental health condition to determine Plaintiff's limitations. [ECF No. 23 at 4-8]

     a.  Medical Opinion Evidence

Plaintiff claims the ALJ erred by assigning too much weight to the opinion of Mark Altomari, Ph.D., who reviewed Plaintiff's claim at the application level, because Dr. Altomari did not review any records after October 2017, including Plaintiff's treatment with his psychiatrist Dr. Joseph Spalding after Plaintiff was hospitalized for a suicide attempt. [ECF No. 18 at 13-15] Plaintiff also asserts the ALJ erred in discounting the opinion of Ms. Lightle, Plaintiff's treating licensed professional counselor, because she did not provide notes from Plaintiff's counseling sessions in support of her opinion.[5] [ECF No. 18 at 13-14] Finally, Plaintiff argues the ALJ gave

---

[5] As will be discussed in further detail later in the memorandum, Ms. Lightle concluded Plaintiff was "significantly impaired in his daily functioning" based on her diagnosis that "[c]linically speaking, [Plaintiff] suffers from anxiety and paranoia which are exacerbated by his physical condition (significant amount of pain in his body)." (Tr. 772) The ALJ found, however, Plaintiff's alleged conditions of anxiety and paranoia were not medically determinable because Ms. Lightle, as a licensed professional counselor, was not an "acceptable" medical source under the Social Security Act. (Tr. 15) See 20 CFR 404.1502(a) (defining an "acceptable medical source"). Plaintiff has not challenged the ALJ's finding on this issue.

14

too little weight to Ms. Lightle's opinion because her determination that Plaintiff's mental health symptoms rendered him "significantly impaired in his daily functioning" was supported by the record as a whole.[6] [ECF No. 18 at 13-15] In response, the Commissioner asserts the ALJ properly evaluated the medical opinion evidence in conjunction with the other evidence in the record.  [ECF No. 5-8]

For claims filed on or after March 27, 2017, such as Plaintiff's claim, the regulations have been amended to eliminate the treating physician rule. The new regulations provide that the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. §§ 404.1520c, 416.920c. Rather, the ALJ will consider all medical opinions according to several enumerated factors: supportability, consistency, relationship with the claimant (e.g., length, frequency, purpose, and extent of treatment), and specialization. Id. The most important factors are supportability and consistency.  Id.

Plaintiff's primary care provider, Kim Peters, N.P., first noted that Plaintiff suffered from depression in May 2016, shortly after the death of his fiancé, and prescribed him the anti-

---

In determining a claimant's RFC, however, the ALJ was to consider "the combined effect of both [his] severe and non-severe medically determinable impairments[.]" Ford v. Astrue, 518 F.3d 979, 981 (8th Cir. 2008). See also 20 CFR 404.1545(a)(2) (If the claimant has more than one impairment, the Commissioner "will consider all of your medically determinable impairments…, including your medically determinable impairments that are not "severe,"… when we assess your residual functional capacity."). Neither party has addressed whether Ms. Lightle's opinion regarding Plaintiff's limitations due to anxiety and paranoia should be considered at all in the determination of Plaintiff's RFC in light of the ALJ's finding that the conditions were not medically determinable.

[6] Within his argument that the ALJ mis-weighed the medical opinions regarding his mental health condition, Plaintiff includes observations that the ALJ found (1) the opinion of Ms. Colyar, one of his treating worker's compensation providers, to be unpersuasive and (2) the opinion of Dr. Manuel Salinas, a physician who reviewed Plaintiff's claim at the application level, to be persuasive even though Dr. Salinas did not review records after October 2017, including Plaintiff's treatment for pain. [ECF No. 18 at 13] Both Ms. Colyar's and Dr. Salinas's opinions were focused on Plaintiff's shoulder and back conditions and were generally unrelated to Plaintiff's mental health condition. In his brief, Plaintiff did not develop any argument supporting a claim that the ALJ improperly weighed the medical opinion testimony with regard to his physical condition.

depressant paroxetine. (Tr.  451, 477-79)  In June 2016, Plaintiff reported the paroxetine was helping with his mood and Ms. Peters noted that Plaintiff was not "teary in the office today." (Tr. 473) Between December 2016 and February 2017, Ms. Peters documented that Plaintiff suffered from anger and depression, and experienced frequent crying episodes as a result of the pain in his back and right shoulder. (Tr.  457, 466) During this time, Ms. Peters monitored Plaintiff's medication and adjusted his dosage. (Tr. 467, 463, 458)

Between October 26, 2017, and November 1, 2017, Plaintiff was admitted to Blessing Hospital for psychiatric treatment after endorsing suicidal ideations. (Tr. 549-565, 647-649) Plaintiff reported having "a number of psychosocial stressors at that time, including the recent passing of his mother and conflict with his sister" and that his continuing pain was a factor in his depressive symptoms. (Tr.  549-565)  Records from Blessing Hospital revealed Plaintiff had not taken his prescribed depression medication in the three weeks prior to his admission. (Tr. 549-564) During his admission at Blessing Hospital, Plaintiff started Cymbalta.  (Tr.  549-564, 566-67)

In November 2017, following his discharge from Blessing Hospital, Plaintiff began individual counseling with Ms. Lightle. (Tr.  772-775) In December 2017, Plaintiff established psychiatric treatment with Dr. Joseph Spalding. (Tr.  566-67). Dr. Spalding diagnosed Plaintiff with major depressive disorder and continued Plaintiff on Cymbalta because Plaintiff reported that the medication improved his mood and alleviated some of his back pain. (Tr.  566-67, 568)   Dr. Spalding noted Plaintiff had a depressed mood, with slowed motor activity and exhibited only "partial insight." (Tr.  566-597) However, between December 2017 and August 2018, Dr. Spalding consistently observed that Plaintiff: was cooperative; with a full affect, clear speech, logical thought processes, and average intelligence; and exhibited normal judgment, cognition,

16

perception, and thought content. (Id.).[7] (Tr.  566-597) Between April and August 2018, Plaintiff reported to Dr. Spalding that Cymbalta took "a lot of the edge off[,]" he was enjoying group therapy, and he had made several friends.  (Tr.  580,  586, 595)  During this period, Dr. Spalding found Plaintiff was stable and doing "well overall." (Tr.  580, 586,  595)

After his hospitalization, Plaintiff reported to Ms. Peters that he had been experiencing symptoms of depression, "associated with death of a loved one and recent changes in life" but felt that the hospitalization and new medication had helped his depression. (Tr.  636, 640, 641, 645) Between February and December 2018, Plaintiff informed Ms. Peters that, although he was experiencing symptoms of depression and his depression was "not to where he wants it to be," his depression was improving with the Cymbalta and group counseling. (Tr. 598, 599, 605, 608, 612, 619, 625, 630) During visits between June 2016 and December 2018, Ms. Peters noted Plaintiff's depression and anxiety but observed that he was able to articulate well with normal speech, language, coherence, attention span, and concentration. (Tr.  462, 466, 471, 526, 531, 536, 601, 622, 633, 639)

In assessing Plaintiff's mental RFC, the ALJ reviewed the January 22, 2019 letter submitted by Ms. Lightle outlining her counseling relationship with Plaintiff since November 2017 for anxiety and paranoia. (Tr.  27, 772-774) Ms. Lightle stated Plaintiff suffered from episodes of significant pain which caused him to become "more irritable with those around him and necessitated that he rest" and that these episodes occurred three or more times per month, each lasting four to five days at a time. (Tr.  772) Ms. Lightle's letter concluded that Plaintiff's mental health symptoms rendered him "significantly impaired in his daily functioning." (Id.)  The ALJ

---

[7] The only deviations from these findings were in March 2018 when Dr. Spalding observed that Plaintiff had mild impaired judgment with regard to his ability to make reasonable decisions, and in April 2018 when Dr. Spalding observed that Plaintiff's cognition was impaired with regard to his fund of knowledge. (Tr. 574, 580).

did not find Ms. Lightle's opinion to be persuasive because the ALJ was unable to assess the support for Ms. Lightle's opinions where she did not provide "her contemporaneous notes from counseling sessions" and "her letter did not include a narrative explanation with specific examples or notations in support of her underlying opinion that Plaintiff was 'significantly impaired in his daily functioning.'" (Tr.  27).

The ALJ further found that Ms. Lightle's opinion was not consistent with the other evidence in the record. (Id.) For example, unlike Ms. Lightle, Dr. Altomari, the non-examining state-agency consultant, found that Plaintiff retained the abilities to understand, remember, and carry out simple instructions; maintain adequate attendance; sustain an ordinary routine without special supervision; interact adequately with peers and supervisors; and adapt to most usual changes common to competitive work settings. (Tr.  82-83, 88-89) The ALJ found Dr. Altomari's opinion to be "generally persuasive[,]" noting that Dr. Altomari supported his opinion with a narrative explanation that cites to the evidentiary record. (Tr.  26, 83).  The ALJ also concluded that Dr. Altomari's findings were largely consistent with the other evidence in the record, including the treatment records of Dr. Joseph Spalding, Plaintiff's psychiatrist from December 2017 through August 2018, who consistently described Plaintiff as cooperative with full affect, clear speech, logical thought processes, average intelligence, and normal cognition, perception, and thought content. (Tr.  26, 568, 574, 580, 586, 593).

The ALJ also completed the psychiatric review technique prescribed by the regulations for assessing the severity of Plaintiff's mental impairments.[8] In doing so, the ALJ considered the

---

[8] When a claimant has a mental impairment, the Social Security Act requires the ALJ to employ the psychiatric review technique when evaluating the severity of the claimant's mental impairments. Cuthrell v. Astrue, 702 F.3d 1114, 1117 (8th Cir. 2013) (citing 20 C.F.R. § 404.1520a(a), 416.920a(a)). The psychiatric review technique requires the Commissioner to "first evaluate [the claimant's] pertinent symptoms, signs, and laboratory findings to determine whether [the claimant has] a medically determinable mental impairment(s)." Id. at 1118 (citing 20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1)). The

medical records and Plaintiff's testimony and self-reported activities of daily living, and concluded that Plaintiff had only mild or moderate limitations in the functional areas. (Tr. 16-17) For example, Plaintiff acknowledged that he was able to pay his bills and handle a bank account, interacted with others online and over the phone, did not have problems getting along with others including authority figures, could handle changes in routine if necessary, and regularly left the house to shop. (Id.) Plaintiff also testified to meeting his girlfriend and making new friends over the previous year. (Tr. 50) The ALJ found that these limitations were consistent with the opinion of Dr. Altomari and the observations of Dr. Spalding and Ms. Peters. (Tr. 16-17) Based on medical record notations that Plaintiff "exhibited an irritable or depressed mood at times," however, the ALJ limited Plaintiff with respect to his interactions with the public. (Tr. 25-26)

Plaintiff argues the ALJ erred in discounting Ms. Lightle's opinion based on her failure to provide her contemporaneous notes from Plaintiff's counseling sessions. [ECF No. 18 at 13-14] Plaintiff correctly notes that the Social Security Administration's Form SSA-827 authorizes the disclosure of "[a]ll records and other information regarding my treatment, hospitalization, and outpatient care for my impairment(s) including, and not limited to: Psychological, psychiatric or other mental impairment(s) (excludes "psychotherapy notes" as defined in 45 CFR 164.501)."[9] (Tr. 134) Plaintiff asserts that "[t]he ALJ cannot discredit Plaintiff's very real symptoms of

_____

Commissioner then rates "the degree of functional limitation" in the following four broad functional areas: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. 20 C.F.R. §§ 404.1520a(c), 416.920a(c).

[9] Psychotherapy notes are defined as "notes recorded (in any medium) by a health care provider who is a mental health professional documenting or analyzing the contents of conversation during a private counseling session or a group, joint, or family counseling session and that are separated from the rest of the individual's medical record." 45 CFR 164.501. They exclude "medication prescription and monitoring, counseling session start and stop times, the modalities and frequencies of treatment furnished, results of clinical tests, and any summary of the following items: Diagnosis, functional status, the treatment plan, symptoms, prognosis, and progress to date." Id.

depression and anxiety, related to his pain, because records, that Social[] Securit[y's] authorizations said do not send, were not provided." [ECF No. 18 at 14]

Plaintiff correctly states that it was not necessary for Ms. Lightle to provide the ALJ with her session notes. However, the ALJ did not discount Ms. Lightle's opinion solely due to the lack of counseling session notes. See Mathias v. Berryhill, 1:18-cv-260, 2019 WL 1594340 *11, (N.D. Ind. April 15, 2019) ("SSA's own policy recognizes the extra protection afforded to psychotherapy notes and indicates that the notes are not needed."). Instead, the ALJ determined that Ms. Lightle's opinion was unpersuasive because: (1) her letter did not contain a narrative explanation with specific examples or notations in support of her underlying opinion that Plaintiff was "significantly impaired in his daily functioning;" and (2) her opinion was inconsistent with the other evidence in the record.

Even if the ALJ erred in discrediting Ms. Lightle's opinion based on her failure to provide her notes, reversal is not required if the error was harmless. Any error is harmless if "'[t]here is no indication that the ALJ would have decided differently' if the error had not occurred." Grindley v. Kijakazi, 9 F.4th 622, 629 (8th Cir. 2021) (quoting Van Vickle v. Astrue, 539 F.3d 825, 830 (8th Cir. 2008)). Here, Plaintiff has failed to demonstrate that reversal was required because the ALJ provided multiple compelling bases for discounting Ms. Lightle's opinion, including that her opinion conflicted with Ms. Peters' and Dr. Spalding's treatment notes.

Plaintiff also argues that while Ms. Lightle's notes from the counseling sessions were not available to corroborate Plaintiff's symptoms, the records from his mental status exams "note he has depression and anxiety." [ECF No. 18, page 14]. Specifically, Plaintiff asserts that the records demonstrated that Plaintiff suffered from "depression and anger [] caused by his back and shoulder pain[,]" was hospitalized for suicidal ideations in October 2017, and was diagnosed with "severe

major depressive disorder" by Dr. Spalding. Based on these medical records, Plaintiff maintains the record "as a whole supports the limitations noted by Plaintiff's counselor."

Plaintiff's observation that the record supports a finding that he suffered from a depressive disorder does not necessarily support the conclusion that the ALJ erred in determining Plaintiff's RFC. As already noted, the ALJ completed the psychiatric review prescribed by the regulations, determined that Plaintiff had a depressive disorder, and added a restriction to Plaintiff's RFC that accounted for the mild to moderate limitations caused by his disorder. Despite the existence of Plaintiff's depressive disorder, Dr. Altomari concluded that Plaintiff had the ability to understand, remember, and carry out simple instructions; maintain adequate attendance; sustain an ordinary routine without special supervision; interact adequately with peers and supervisors; and adapt to most usual changes common to competitive work settings.

The ALJ provided an adequate basis for crediting Dr. Altomari's opinion regarding Plaintiff's abilities, including that his assessment was consistent with other evidence in the record. In sum, the ALJ did not err in finding that the record as a whole was more consistent with Dr. Altomari's opinion than Ms. Lightle's opinion. Nor did the ALJ err in determining that the only necessary mental RFC limitation was that Plaintiff have no close interactions with the public.

b.   Duty to develop the record

Plaintiff also argues the ALJ erred by failing to adequately develop the record. [ECF No. 18 at 14] More specifically, Plaintiff contends the ALJ should have ordered a consultative mental health examination instead of discounting Ms. Lightle's opinion because Ms. Lightle did not provide treatment notes from Plaintiff's individual counseling sessions. [Id.] In response, the Commissioner asserts the ALJ  was not required to order a consultative mental health examination

because the record was adequate for the ALJ to fully and fairly consider Plaintiff's allegations and to determine his limitations. [ECF No. 23 at 8]

The ALJ "has a duty to fully and fairly develop the evidentiary record." Byes v. Astrue, 687 F.3d 913, 915-16 (8th Cir. 2012). In some cases, the duty to develop the record requires the ALJ to obtain medical evidence, such as a consultative examination of the claimant, before rendering a decision. See 20 C.F.R. §404.1519a(b). "The ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." McCoy, 648 F.3d at 612. "[I]t is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision." Freeman v. Apfel, 208 F.3d 687, 692 (8th Cir. 2000) (quoting Reeves v. Heckler, 734 F.2d 519, 522 n. 1 (11th Cir.1984)).

As set forth above, the records of Plaintiff's mental health condition and treatment consist of those from: (1) his primary care provider, Ms. Peters, from June 3, 2015 through December 6, 2018; (2) Blessing Hospital, where Plaintiff was admitted for psychiatric treatment from October 26, 2017 through November 1, 2017; (3) Dr. Joseph Spalding, Plaintiff's psychiatrist, from December 12, 2017 to August 14, 2018; and (4) Ms. Lightle, Plaintiff's licensed professional counselor, from November 13, 2017 to January 22, 2019. The ALJ reviewed Plaintiff's medical records, the medical opinions, and Plaintiff's reported activities before concluding that the only necessary restriction for the RFC was no close interaction with the public.

Despite the absence of contemporaneous session notes from Plaintiff's individual therapy sessions, the record contained substantial evidence of Plaintiff's mental condition such that the record did not require further development. The record included detailed reports from multiple sources, collected over a period of years. These reports were largely consistent with each other and

the opinion of Dr. Altomari. Given the substantial evidence of Plaintiff's mental impairment, this is not a case in which a crucial issue was undeveloped, and it was not necessary for the ALJ to order a consultative examination or obtain further evidence.

### 2. Physical RFC

Plaintiff challenges the ALJ's physical RFC determination, arguing it was contrary to the objective medical evidence and Plaintiff's subjective complaints, and was based on the ALJ's independent medical findings. [ECF No. 18 at 15-20] More specifically, Plaintiff argues substantial evidence does not support the ALJ's determination that Plaintiff could perform a limited range of sedentary work because the ALJ erroneously found the medical records from July through December 2018 were inconsistent with Plaintiff's testimony that he felt at risk of falling and needed to lie down due to his back pain.[10] [ECF No. 18 at 16-17] Plaintiff also contends that "objective and subjective evidence establish Plaintiff would not be able to lift 10 lbs. even on an occasional basis[,]" as required by the definition of sedentary work in 20 C.F.R. § 404.1567(a). [ECF No. 18 at 18]. Finally, Plaintiff argues the ALJ did not include sufficient limitations to account for Plaintiff's diabetic neuropathy based on the ALJ's independent medical findings regarding Plaintiff's condition. [Id. at 18]  In response, the Commissioner maintains the ALJ properly evaluated Plaintiff's "statements and allegations about his symptoms and limitations" in

---

[10] Plaintiff also alleges the ALJ erred in finding that the medical records during this period were inconsistent with Plaintiff's testimony that he "needed to…elevate his legs during a normal day." [ECF No. 18 at 16] Plaintiff observes in his brief that medical records from May 2017 state that Plaintiff's "lower extremity edema was worsening and he was encouraged to elevate his legs, among other recommendations." [ECF No. 18 at 16] At the hearing, Plaintiff testified that he has "to watch what [he does] and [] how much salt [he uses]" because his legs swell a "couple of times a week[.]" (Tr.  55-56) Plaintiff testified that elevating his legs alleviates the swelling. (Tr.  55-56) While this testimony suggests that Plaintiff may, at times, need to elevate his legs, Plaintiff's brief fails to direct the Court's attention to any testimony by Plaintiff demonstrating that he "needed to…elevate his legs during a normal day." [ECF No. 18 at 16] Plaintiff also failed to develop an argument supporting a finding that additional limitations to the RFC were required based on Plaintiff's pedal edema.

conjunction with Plaintiff's activities, and the ALJ's evaluation of the objective medical evidence. [ECF No. 23 at 9-10].

        a.   <u>ALJ's determination regarding whether Plaintiff was a fall risk and needed to lie down due to back pain</u>

Plaintiff argues the ALJ's RFC determination was not supported by substantial evidence because the ALJ  erroneously concluded that the medical records from July through December 2018 were not consistent with Plaintiff's testimony that he risked falling due to his back pain and he needed to lie down during a normal day. [ECF No. 18 at 16-17 ]

In determining the credibility of a plaintiff's subjective complaints, a court considers the following factors: 1) the claimant's daily activities; 2) the duration, intensity, and frequency of the symptoms; 3) precipitating and aggravating factors; 4) the dosage, effectiveness, and side effects of medication; 5) any functional restrictions; 6) the claimant's work history; and 7) the absence of objective medical evidence to support the claimant's complaints.  <u>Finch v. Astrue</u>, 547 F.3d 933, 935 (8th Cir. 2008) (citing <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984) and <u>Wheeler v. Apfel</u>, 224 F.3d 891, 895 (8th Cir. 2000)). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [a court] will normally defer to the ALJ's credibility determination." <u>Gregg v. Barnhart</u>, 354 F.3d 710, 714 (8th Cir. 2003).  <u>See</u> <u>also</u> <u>McDade v. Astrue</u>, 720 F.3d 994, 998 (8th Cir. 2013).

Magnetic resonance imaging (MRI) from May 2016 showed paracentral disc protrusions with cord effacement at the T5-T6, T8-T9, and T9-T10 levels. (Tr.  433) In May 2016, Plaintiff's physician, Dr. Matt Thornburg, noted Plaintiff exhibited normal strength, tenderness at the T8-10, and minimal paraspinal tenderness, and placed Plaintiff on work restrictions of "[n]o lifting more than 10 lbs., no stooping, no pushing or pulling more than 15 lbs." (Tr.  393, 396) In June 2016, Plaintiff received an epidural steroid injection for his thoracic spine pain which provided only mild

relief. (Tr.  437). Also in June 2016, Dr. Thornburg's examined Plaintiff and reported good coordination; no evidence of tenderness to palpation at the midline, paraspinal or trapezial; normal spinal range of motion; full strength in all spinal areas tested, and normal gait and station. (Tr. 405-407) Between August 2016 and November 2016, Dr. Thornburg found Plaintiff had mild tenderness in the mid-thoracic spine and normal strength, range of motion, gait, and station. (Tr. 412, 416, 421) In November 2016, Plaintiff reported to Dr. Thornburg numbness and tingling in his legs "with prolonged standing" and feeling that he was going to fall. (Tr.  421)

The medical records demonstrate that at appointments in April, July, and October 2018, Plaintiff reported to either Ms. Peters or Dr. Luvell Glanton that he had  "no history of falls."  (Tr. 627, 621, 610) Additional medical records demonstrate Plaintiff reported experiencing a history of falls to Ms. Peters during appointments in October and December 2018, including reporting to Ms. Peters in December that he had suffered "[t]hree falls in the past two weeks due to legs not having enough feeling to stay standing."[11] (Tr.  599, 615)

Dr. Glanton examined Plaintiff on October 1, 2018, and November 28, 2018, and observed moderate tenderness to palpation and muscle spasms, and some decreased range of motion. (Tr. 604-607, 614-617)  Dr. Glanton found Plaintiff had normal sensation, coordination, and reflexes; full strength; and no swelling. (Id.) During those visits and at another with Ms. Peters in October 2018, Plaintiff reported that his symptoms were exacerbated by lifting, sitting, standing, and walking, and were relieved by ice, heat, rest, lying supine, and physical therapy. (Tr.  604, 608, 614)

A lumbar MRI performed in November 2018, showed Plaintiff had "severe" degenerative disc disease at the L5-S1 level, with broad-based annual disc bulge and central disc protrusion,

---

[11] The medical records from Plaintiff's appointment with Dr. Glanton on November 28, 2018, stated both that there is a "[h]istory of falls" and that there is "[n]o history of falls." (Tr.  605).

moderate spinal canal stenosis, severe bilateral foraminal stenosis, and some facet joint arthropathy. (Tr.  765)   Plaintiff also had a broad-based annular disc bulge at the L3-L4 and L4-L5 levels as well has facet joint arthropathy and spinal canal stenosis. (Tr.  765)

Based on the objective findings and Plaintiff's subjective reports of pain, the ALJ limited Plaintiff to performing sedentary work. The ALJ concluded that the findings of the objective physical examinations did not warrant additional limitations of function, noting that the physical examinations from July through December 2018 reflected Plaintiff had some tenderness in his back, but no sensory or motor deficits, no weakness, and no pedal edema. (Tr.  23) The ALJ found that these examinations were not consistent with the Plaintiff's allegations that he fell down (or felt at risk of falling down) at times due to his back pain, or that he needed to lay down over the course of a normal day. (Tr.  23)  In further support, the ALJ noted that Plaintiff declined several treatments for his back and concluded that Plaintiff's self-reported daily activities, including driving, were "not reasonably consistent with his allegations of fully debilitating back pain and lower extremity symptoms that required him to lay down or elevate his legs on a regular basis during the day." (Tr.  24)[12]

With regard to his testimony that he was a fall risk, Plaintiff acknowledges that the ALJ's conclusion that the July through December 2018 medical records were not consistent with this testimony "may be true to some extent…[but] there are other records from the relevant period that do support these claims and therefore further limitations." [ECF No. 18 at 16]. In support, Plaintiff

---

[12]  When evaluating a claimant's subjective complaints, the ALJ may consider the claimant's noncompliance with medical treatment and his activities of daily living. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001) (ALJ may consider noncompliance with medical treatment in discrediting subjective complaints), and Reece v. Colvin, 834 F.3d 904, 910 (8th Cir. 2016) (ALJ may discount a claimant's subjective complaints of disabling pain if they are inconsistent with his activities of daily living).

cites to records showing he suffered a fall in August 2016, that he reported "intermittent[ly]" feeling as if he was "going to fall" in November 2016, and that he reported having a history of falls in February, October, and November 2018. (Tr.  411, 421)

As Plaintiff acknowledges, the record contains conflicting evidence on this issue. Thus, the ALJ's accurately observation that, while Plaintiff reported problems with balance and having fallen at times, his "treatment records do not reflect that he relayed such symptoms to his providers on a regular basis." (Tr.  24). The Court will not reverse the ALJ's decision simply because it is possible to draw an "inconsistent position" from the evidence. See Wright, 789 F.3d at, 852 (the court must affirm the ALJ's decision if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings[.]") The Court finds the ALJ considered Plaintiff's subjective complaints within the context of the entire record and concluded that the record undermined the credibility of his claims of disabling symptoms.  Because the ALJ's determination not to credit Plaintiff's subjective complaints was supported by "good reasons and substantial evidence," the Court defers to his determination.  See Gonzales, 465 F.3d at 894.

Plaintiff also contends that the ALJ's finding that the "records from July to December 2018 are not consistent with a need to lie down" is "grossly inaccurate" and contrary to additional objective evidence supporting Plaintiff's testimony that he needed to lie down to relieve his back pain. [ECF No. 18 at 17] Plaintiff maintains that medical records demonstrate that he reported needing to lie down to relieve his back pain to his providers at appointments in April and May 2016, August 2017, and October and November 2018. [ECF No. 18 at 17] Plaintiff asserts that these records are consistent with his testimony that he was confined to lying flat in bed four to six days a month due to his back pain.  [ECF No. 18 at 17]

In April and May 2016, Plaintiff reported to providers that he had experienced back pain since his February workplace injury that was only relieved by "lying down[.]" (Tr. 332, 392)  The records from August 2017 state Plaintiff reported that his "back pain is worsened by standing, sitting, walking, bending, leaning forward" and that "he was only able to tolerate walking for 10 minutes prior to having to sit down and lay down." (Tr. 514) Plaintiff also reported that heating pads, "as well as resting, lying down on his back" relieved the pain. (Tr. 514) Dr. Glanton's and Ms. Peters' records from October and November 2018 state that Plaintiff's back pain is "exacerbated by lifting, sitting, standing and walking" and that the symptoms are relieved by "ice, heat, rest, lying supine and physical therapy." (Tr. 608, 675)

While the medical records support a finding that lying down alleviated Plaintiff's back pain, the records do not conclusively support Plaintiff's assertion that he is required to lie down at such regular intervals that he is prevented from engaging in competitive employment. Indeed, Plaintiff reported using several methods to alleviate his back pain and testified that he spent the majority of his day sitting in either a straight back chair or a recliner. Again, the ALJ considered Plaintiff's testimony but found that the medical records and Plaintiff's reported activities detracted from the credibility of Plaintiff's subjective complaints. Because the ALJ's determination not to credit Plaintiff's subjective complaints was supported by "good reasons and substantial evidence," the Court defers to his determination.  See Gonzales, 465 F.3d at 894.

### b.  ALJ's determination that Plaintiff could occasionally lift 10 pounds

Plaintiff also argues the ALJ's determination that Plaintiff could perform sedentary work was not supported by substantial evidence because "objective and subjective evidence establish Plaintiff would not be able to lift 10 lbs. even on an occasional basis[,]" as required by the

28

definition of sedentary work in 20 C.F.R. §§ 404.1567(a), 416.967(a).[13] [ECF No. 18 at 17].

Relying on his testimony that he had to seek treatment in the emergency room after lifting a 10-pound bag of potatoes in August 2018 and after moving 7- to 8-pound boxes in June 2018, Plaintiff argues the ALJ's RFC determination is not supported by substantial evidence because the "evidence as a whole shows Plaintiff unable to lift something that weighs seven or eight pounds without having to take a trip to the ER for pain." [ECF No. 18 at 17-18].

While the ALJ's RFC determination that Plaintiff could perform sedentary work, which includes occasionally lifting up to 10 pounds, conflicts with Plaintiff's testimony that he injured his back while lifting items weighing between 7 to 10 pounds, the ALJ's determination is supported by other evidence in the record. In April 2016, Ms. Colyar, one of Plaintiff's worker's compensation providers, set return-to-work restrictions that included no lifting over 10 pounds; no pushing or pulling over 15 pounds; no jumping or climbing; and limited bending, squatting, kneeling, or stooping. (Tr. 333). In May 2016, Dr. Thornburg, Plaintiff's physician for his thoracic spine pain, placed Plaintiff on work restrictions of "[n]o lifting more than 10 lbs., no stooping, no pushing or pulling more than 15 lbs." (Tr. 393, 396) These ratings are generally consistent with Plaintiff's testimony at the February 2019 hearing that he had "a weight restriction of ten pounds or less" because of his back. (Tr. 51-52). Upon review of the record as a whole, the Court finds substantial evidence supported the ALJ's determination that Plaintiff was able to perform sedentary work with numerous non-exertional limitations.

c. Independent medical findings

---

[13] Sedentary work requires "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. 20 C.F.R. §§404.1567(a), 416.967(a).

Finally, Plaintiff argues the ALJ's physical RFC is not supported by substantial evidence because the ALJ made independent medical findings in determining the RFC. Specifically, Plaintiff argues the ALJ "disregard[ed] peripheral neuropathy as an impairment that would cause limitations stating the monofilament examination has positive sensation throughout both feet, and Plaintiff's blood sugars has improved with medications." [ECF No. 18 at 18]. Plaintiff contends the ALJ erred because he was "not free to make independent medical findings or to draw inferences from medical reports[,]" including inferences from monofilament examinations "when this specific examination is only a diagnostic tool in an entire tool kit physicians use." [14] [ECF No. 18 at 18-19].

The ALJ found the evidence, overall, showed that Plaintiff had persistently elevated blood sugars throughout the relevant period, along with paresthesia or loss of sensation at times. (Tr. 24) The ALJ concluded, however, the objective evidence regarding Plaintiff's diabetes and peripheral neuropathy "does not persuasively illustrate that the claimant could not perform a range of sedentary work" because Plaintiff's medication "Neurontin helped with [this] symptom and monofilament exams conducted after that time were unremarkable." (Tr. 24)  The ALJ's RFC included limitations to no jobs on unimproved terrain or that would expose Plaintiff to whole body vibrations. (Tr. 18)

---

[14] Plaintiff's argument on this point includes two passing references to his carpal tunnel diagnosis and the ALJ's RFC limitations to frequent but not repetitive use of his upper extremities for fine and gross motor skills. [ECF No. 18 at 18]. Although Plaintiff testified that he suffered from "occasional" neuropathy in his hands (Tr. 62) the structure of the ALJ's decision suggests that the ALJ considered Plaintiff's diabetic peripheral neuropathy to impact his lower extremities and not his upper extremities. While some of the medical records did not specify whether Plaintiff's neuropathy symptoms occurred in his upper or lower extremities, many of the records state Plaintiff experienced "bilateral foot pain" related to his diabetes. (Tr. 598, 608, 619).  Because Plaintiff has not developed any argument related to his upper extremities, either from carpal tunnel syndrome or peripheral neuropathy, the Court finds the ALJ's RFC limitations related to Plaintiff's upper extremities is supported by substantial evidence.

Consistent with the ALJ's finding, the medical records demonstrate Plaintiff reported experiencing some degree of diabetic peripheral neuropathy since January 2015. (Tr.  450-508)  In 2015, Ms. Peters prescribed gabapentin, which Plaintiff reported "improved" the "tingling" in his legs. (Tr.  490-91, 487)  Ms. Peters subsequently increased the gabapentin dosage. (Tr.  486, 612) In February 2018, Plaintiff reported experiencing "intermittent numbness" in his legs. (Tr.  632) In April and July 2018, Plaintiff stated that he felt the additional medication Naproxen was helping the numbness and tingling in his feet, and that he had the sensation only "intermittently." (Tr.  623, 629)   Medical records from late October 2018, demonstrate that a monofilament exam was unremarkable but that Ms. Peters increased Plaintiff's dosage of gabapentin after Plaintiff reported that the "numbness and tingling" was "worsening." (Tr. 611-612) By December 2018, Plaintiff advised Ms. Peters that the "numbness and tingling" was "stable at this time" and another monofilament exam provided unremarkable results. (Tr.  601-602)

Assuming arguendo that the ALJ erred in considering the monofilament exams, Plaintiff has not demonstrated that the alleged error requires reversal. See Grindley, 9 F.4th at 629 (reversal is not required if the error was harmless). Even absent the results of the monofilament examinations, the record demonstrates that Plaintiff's diabetic neuropathy improved with medication, such that Plaintiff reported the symptoms were only "intermittent" and, most recently, were "stable." "If an impairment can be controlled by treatment or medication, it cannot be considered disabling." Hensley v. Colvin, 829 F.3d 926, 933-34 (8th Cir. 2016) (quoting Brace v. Astrue, 578 F.3d 882, 885 (8th Cir. 2009)).  See also Hoskin, 2020 WL 870985, at *7 ("The ALJ … properly considered that [the claimant] reported some symptom improvement from her prescribed medication."). In determining Plaintiff's RFC, which included a restriction that Plaintiff perform no jobs on unimproved terrain or that would expose him to whole body vibrations, the

ALJ properly considered Plaintiff's medical records, medical opinion evidence, and the testimony with regard to Plaintiff's peripheral neuropathy. The Court therefore finds substantial evidence on the record supported the ALJ's RFC determination.

## VI.    Conclusion

For the reasons discussed above, the Court finds that substantial evidence in the record as a whole supports Defendant's decision that Plaintiff is not disabled. Accordingly,

**IT IS HEREBY ORDERED** that the final decision of Defendant denying Social Security benefits to Plaintiff is **AFFIRMED**.

A separate judgment in accordance with this Memorandum and Order is entered this date.

PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 10th day of March, 2022